IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MONIQUE L. MATHERSON, | Civil Action No.: |
| Plaintiff, | |
| vs. | |
| THERMO FISHER SCIENTIFIC, INC., | COMPLAINT AND DEMAND FOR JURY TRIAL |
| Defendant. | |

## COMPLAINT FOR DAMAGES

**COMES NOW** Plaintiff, **Monique L. Matherson** (hereinafter "Ms. Matherson" or "Plaintiff"), by and through the undersigned counsel, and sets forth her Complaint and Jury Demand against the above-named Defendant, Thermo Fisher Scientific, Inc., (hereinafter "Defendant" or "Thermo Fisher"), seeking damages and injunctive relief and shows this Court as follows:

### INTRODUCTION

1.

Plaintiff brings this action under Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C.§ 12101 *et seq.* (ADA) to recover (1) lost pay, vacation, retirement benefits and healthcare benefits, (2) compensatory damages for physical and emotional distress, (3) interest on

her damages, calculated at the prevailing rate (4) punitive damages, and (5) her costs of litigation, including her reasonable attorneys' fees for Defendant's violations of the ADA.

**PARTIES**

2.

Plaintiff is a resident and citizen of the State of Georgia.

3.

Plaintiff submits to the jurisdiction and venue of this Court.

4.

Defendant is a foreign profit corporation, organized under the laws of the state of Delaware, registered to conduct business in the state of Georgia, and subject to the jurisdiction of this Court, with offices at 168 Third Avenue, Waltham, MA, 02451.

5.

Service may be made upon Defendant by serving its registered agent Capitol Corporate Services, Inc. at 3675 Crestwood Pkwy, NW, Suite 350, Duluth, Georgia, 30096, if service is not waived.

6.

Defendant is subject to the jurisdiction and venue of this Court.

**JURISDICTION AND VENUE**

7.

Plaintiff is subject to the jurisdiction and venue of this Court.

8.

This Court has jurisdiction over this case and Defendant.

9.

This Court has subject matter jurisdiction over this case.

10.

The jurisdiction of this court is invoked pursuant to 42 U.S.C. § 12117(a) and 42 U.S.C §2000e-5(f)(3) (ADA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332(a) (diversity of citizenship), 28 U.S.C. §1343 (civil rights), and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

11.

Venue in this case is proper pursuant to 28 U.S.C. §1391(b) because the Defendant conducts business in this district and division and the unlawful employment practices described herein

were committed within the State of Georgia, in the Northern District of Georgia.

**ADMINISTRATIVE PROCEEDINGS**

12.

All conditions precedent to this lawsuit within the meaning of Fed. R. Civ. P. 9(c) have been performed or otherwise occurred or have been prevented by the action or inaction of Defendant.

13.

Plaintiff properly and timely filed her charges of disability discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC"), within 180 days of Defendant's discriminatory and retaliatory acts.

14.

On March 9, 2021, Plaintiff received a Notice of Right to Sue from the EEOC, dated February 22, 2021.

15.

This Complaint is filed within 90 days after Plaintiff's receipt of the Right to Sue letter. This action is timely filed, and Plaintiff has satisfied all conditions precedent to the filing of this action within the meaning of Fed. R. Civ. P. 9(c).

**FACTUAL STATEMENT**

16.

This is a straightforward case where Defendant did not want to accommodate a new hire, even though it was required to do so under the ADA.

17.

Ms. Matherson was hired by Defendant as a Customer Service Representative I ("CSR") in October 2018.

**Ms. Matherson's Accommodation Requests**

18.

When Ms. Matherson applied for the position at Thermo Fisher in August 2018, she affirmed that she had a disability.

19.

Once she was offered a position by Thermo Fisher, she again affirmed that she was disabled and went into detail about the accommodations needed on the new hire paperwork. It was her assumption that someone in HR would review the new hire paperwork and would then advise management accordingly.

20.

When Ms. Matherson first started at Thermo Fisher and went to meet with Donna Cannon to discuss her disability and necessary accommodations, Ms. Cannon acted as if she had no idea that Ms. Matherson was disabled.

21.

It is Plaintiff's belief that Ms. Cannon decided immediately that she was not going to accommodate a new hire and that is why Ms. Matherson was met with roadblock after roadblock throughout her employment.

22.

Ms. Matherson was and still is qualified for the CSR position she held at Thermo Fisher. She has over 25 years of customer service experience. In fact, every position Ms. Matherson has ever held involved over-the-phone and in-person customer service. Ms. Matherson has always excelled in the workplace, often being promoted within months of being hired.

23.

Ms. Matherson's 2018 Year-end Review was outstanding and resulted in a $0.50 per hour raise. Attached as Exhibit "1" to this Complaint is Ms. Matherson's 2018 Year-end Review. Also attached as Exhibit "2" to this Complaint are several customer reviews from her time at Thermo Fisher.

24.

These reviews demonstrate her outstanding customer service skills. In fact, Ms. Matherson was on the "Perfect 10 Team" during the month of February 2019. From her recollection, there were only 10 agents on that list out of

nearly 100. The other agents were invited to a small celebration and provided lunch. However, Ms. Matherson's Manager Wilma Giles did not acknowledge that Ms. Matherson was on the list and failed to give her time off the phone to partake in the celebration.

25.

Attached as Exhibit "3" to this Complaint are the training assessments from week 2 through week 6. These assessments all indicate what a "strong and capable" agent Ms. Matherson was.

26.

Other than the week 6 assessment showing that Ms. Matherson was out of adherence, there was never any mention of attendance issues because she had perfect attendance throughout training. It is also important to note that everyone in the class was on the overage report for week 6 and everyone received the same feedback.

27.

The expectation Thermo Fisher set prior to being hired was perfect attendance during training. As stated above, Ms. Matherson had perfect attendance during training.

28.

However, others in the class had multiple attendance infractions beginning on week 1 and continuing through week 12.

29.

When Ms. Matherson was fired in April 2019, some of these individuals were still employed there.

30.

There was no Week 1 assessment completed. Weeks 8-12 were on the job training weeks.

31.

Ms. Matherson was supposed to be receiving additional training and support from her manager Ms. Giles and her Team Lead, but no training, coaching, or feedback was provided during that time.

32.

Ms. Matherson first asked for a reasonable accommodation in late October 2018. [1]

33.

Ms. Cannon told her that she could always take three ten-minute breaks, per day if needed.

---

[1] See emails attached as Exhibit "4" to this Complaint, showing Ms. Matherson met with Ms. Cannon in late October 2018 to discuss her situation and the need for accommodations.

34.

Ms. Matherson then explained that as a Type 1 Diabetic with complications, she would rather have a formal accommodation in place.

35.

Ms. Cannon then referred her to the site HR Manager Melanie Seles.

36.

Per the emails attached as Exhibit "4" to this Complaint, Ms. Matherson contacted Ms. Seles on November 5, 2018.

37.

When she did not hear back from Ms. Seles by November 15, 2018, Ms. Matherson sent another email.

38.

Ms. Seles' response was that she would meet with Ms. Matherson, but Ms. Matherson needed to contact the HR1/Accommodations team about her request.

39.

Ms. Matherson immediately responded back, asking for their contact information, but Ms. Seles waited another 5 days before providing that information to Ms. Matherson.

40.

At this point, it had been 4 weeks since Ms. Matherson had started reaching out to management/HR about her need for an accommodation.

41.

When she finally received the contact information for the appropriate team, it was Tuesday, November 20, 2018—just 2 days before the Thanksgiving holiday. However, Ms. Matherson reached out to the team immediately and received an out of office notification stating that they would return Monday, November 26, 2018.

42.

When Ms. Matherson had not received any follow-up by November 28, 2018, she reached out to the unit Manager Mr. Dave Kokoski via telephone.

43.

She got a call back from Mr. Kokoski on November 30, 2018. During their call, he committed to having the required paperwork emailed to her by Monday, December 3, 2018.

44.

Ms. Matherson contacted her Endocrinologist the same day that she received the packet and asked if she could email them the paperwork to speed up the process. However, she was told

that due to HIPPA regulations, she would have to come to the office to sign a release.

45.

Since the Endocrinologist's office was only open during Ms. Matherson's scheduled shift, she had to request a few hours off to go to the doctor's office.

46.

Plaintiff was doing anything she could to speed up the process.

47.

Unfortunately, management failed to grant the time off until Monday, December 12, 2018—nearly 6 full weeks after her initial request to Ms. Cannon.

48.

Ms. Matherson's provider returned the completed paperwork on December 28, 2018 to Thermo Fisher.

49.

However, per the email attached as Exhibit "4", Ms. Matherson did not receive verification that it was received until January 2, 2019.

50.

In late December 2018, Ms. Matherson had begun experiencing severe nausea and other gastrointestinal problems

a few times a week. When this occurred, it caused her blood sugar to go extremely high, which negatively affected her both physically and mentally.

51.

She shared the issues she was experiencing with Ms. Cannon and Ms. Giles and explained that she was going to schedule an appointment with her Endocrinologist.

52.

Again, Ms. Matherson was met with little to no concern for her health and wellbeing. She was instructed to "do what she needed to do" but that she would need to request the time off through the normal process.

53.

Ms. Matherson could have gotten an appointment with her provider the following day; however, since she was forced to follow the "normal process," she could not get time off for another 2 weeks to see her doctor.

54.

Ms. Matherson met with Ms. Cannon and Ms. Giles on January 14, 2019 to discuss what the accommodations team had approved on her first request.

55.

During that meeting Ms. Matherson expressed concern with the structure of what had been approved. She told them that she was unable to "schedule" blood sugar episodes to coincide with scheduled breaks.

56.

Ms. Matherson was not allowed to take breaks when needed. Breaks and lunches are scheduled through Thermo Fisher's Work Force Management program. Taking breaks and lunches outside of what is scheduled affects adherence and can be counted as an attendance infraction if taken more than an hour from the scheduled time.

57.

During the same meeting, Ms. Matherson told them that she was hesitant to sign off on the accommodation at that time given these concerns.

58.

Ms. Cannon stated that per the letter, Ms. Matherson could always go back and request additional accommodations if necessary. She went on to say that Ms. Matherson really needed to sign the current accommodation so that they would have it noted in her file that she was approved for accommodations.

- 13 -

59.

Hesitantly, Ms. Matherson signed the accommodations letter.

60.

During the January 14, 2019 meeting, Ms. Matherson advised Thermo Fisher that she was still experiencing episodes of nausea and gastrointestinal issues and that they were in fact increasing in frequency.

61.

She further explained that she had finally been able to schedule time off and was scheduled to see her provider the following day. She advised Ms. Cannon and Ms. Giles that she would let them know the outcome of that appointment.

62.

Ms. Matherson had her Endocrinologist appointment January 15, 2019. Unfortunately, she was told that what she was experiencing sounded like gastroparesis, which is a common complication of Diabetes. To officially diagnose the issue, though, Ms. Matherson would need to undergo some additional testing.

63.

When Ms. Matherson returned to work January 16, 2019, she shared the outcome of the appointment as promised with Ms.

Cannon and Ms. Giles. Ms. Matherson was again advised that she would need to use the "normal process" to request time off for the required tests.

64.

Ms. Matherson never received any communication from Thermo Fisher's Accommodations team other than to confirm receipt of the first request on January 2, 2019.

65.

Despite multiple emails and phone calls throughout February, March, and April 2019, Ms. Matherson never even received confirmation that the second request was received.

66.

Ms. Matherson's first accommodation request explained her diagnosis and that she would need extra time to test, treat, and recover from high and low blood sugars.

67.

On or around January 14, 2019, Defendant granted the following in relation to Ms. Matherson's first accommodations request: extended her two (2) 15-minute breaks to two (2) 10 minute-breaks and allow her one (1) hour, two (2) times per month for longer episodes.

68.

Ms. Matherson's second accommodation request that was submitted on February 24, 2019 and confirmed received by Defendant on February 27, 2019 included specifics on how often her high or low blood sugar episodes may occur and the amount of time needed for recovery. It also specified that severe flare-ups may occur 1-2 times per month, requiring her to miss an entire day.[2] Plaintiff's accommodation request was essentially to be able to step away from a task to attend to a high or low blood sugar episode and make up the time thereafter that same day (or on a different day if Defendant so chose).

69.

Defendant never engaged in any conversations (i.e. the interactive process) in regard to Ms. Matherson's second accommodation request.

70.

She also made multiple verbal and written requests to the local Management/HR teams for the status of her request. Each time she was told that her request was in the team's hands and she would be notified when a decision was made.

---

[2] See the February 22, 2019 Second Accommodation Request Form, attached as Exhibit "5."

71.

Ms. Matherson was able to coordinate time off for the tests required in early February 2019, all the while she was experiencing these nausea and gastrointestinal issues with increasing frequency causing her to have to log off the phones at Thermo Fisher and recover.

72.

Depending on how high her blood sugar goes, the recovery times vary. Per the second accommodation request, it can take 1-4 hours for Ms. Matherson to recover.

73.

On or about February 4, 2019, Ms. Matherson requested another meeting with Ms. Cannon and Ms. Giles to discuss her "adherence."

74.

The Work Force Management Team ("WFM") had added the additional 10 unpaid minutes to each break on January 14, 2019. However, she immediately noticed that her "adherence" dropped from acceptable to unacceptable and Ms. Matherson wanted to know why.

75.

She was advised that the WFM team could not "figure out" how to properly code the time as to not affect her "adherence."

76.

Ms. Cannon advised that for the time being that Thermo Fisher would not be considering Ms. Matherson's "adherence" in her daily stats and monthly ratings.

77.

Thermo Fisher claimed that the WFM was working on the issue and Ms. Cannon would let Ms. Matherson know when it was fixed.

78.

As of Ms. Matherson's termination date, this issue had not been fixed and was still affecting her rankings.

79.

It became obvious to Ms. Matherson by February 15, 2019 that Thermo Fisher's local Management and HR teams had no intention of helping her with this increasingly stressful situation. Not only was she dealing with a very serious health situation, but she was also working in an increasingly hostile work environment.

## Ms. Matherson's Work Performance

80.

Being a brand-new CSR, there were customer requests that Ms. Matherson and the other CSRs in her class had been unable to cover during training due to time constraints.

81.

The trainer assured them that they would be seated near their Team Leads, as well as tenured agents that could help in those situations. They were instructed to offer a callback if they were unable to resolve the issue and then take the issue to their Manager for resolution and customer callback.

82.

Ms. Matherson's assigned Team Lead was not helpful and at times was extremely hostile towards Ms. Matherson.

83.

Each time Ms. Matherson would ask her for help, she refused saying "you should have learned that in training."

84.

Ms. Matherson shared her concerns about her Team Lead's demeanor and refusal to help with Ms. Cannon and Ms. Giles on several occasions. The only response Ms. Matherson received was that they "were aware of the situation."

85.

Luckily, however, the tenured agents that sat near Ms. Matherson were extremely helpful and did their best to help while still managing their own assigned tasks.

86.

Unfortunately, there were occasions when they were unavailable. When that happened, Ms. Matherson did as instructed and went to Ms. Giles. However, Ms. Giles failed to respond on most occasions and when she did respond, she did not know the answer. She would refer Ms. Matherson to another Team Lead or manager in the office. This further delayed the promised callback and negatively affected the customer experience.

87.

Thermo Fisher policies stated that all new CSRs (from 1 to 6 months of tenure) must meet with their manager weekly to go over their progress, listen to calls, give feedback, and review weekly stats. Ms. Giles would throw Ms. Matherson's weekly stats on her desk but never discuss them with Ms. Matherson—there were no meetings, no coaching, and no feedback.[3]

---

[3] See the multiple blank coaching sheets from January through March 2019, attached as Exhibit "6."

88.

The fact that Ms. Matherson was not getting any support from Ms. Giles, along with the increasingly hostile work environment, caused her a great deal of stress.

89.

The first time Ms. Giles actually completed a coaching sheet and met with Ms. Matherson was March 29, 2019, just three (3) weeks prior to her termination.[4]

90.

They did not discuss Ms. Matherson's attendance, but rather, the fact that she was using after call work ("ACW") a lot and needed to stay available.

91.

ACW is a status the CSRs would put themselves in to keep from getting a new call while finishing up anything needing to be done for a previous call.

92.

Ms. Matherson was using ACW to get assistance from other CSR's since she was receiving no support from her manager or team lead.

---

[4] See the three coaching sheets from March 29 – April 18, 2019, attached as Exhibit "7."

93.

Ms. Matherson had been meeting all the required performance goals throughout her training; however, the issues with her performance only arose when she was placed on Ms. Giles' team.

94.

There were times Ms. Matherson had to get out of her seat and walk around the floor looking for other team leads and managers for help because she could not get help from her leadership team.

95.

During week 2 of training, the class was sent to sit with agents from all teams. The agents that were sent to sit with members of Ms. Giles' team all said the agents on Ms. Giles team were very vocal about the fact that Ms. Giles was incompetent and that there were concerns with her managerial abilities.

96.

Ms. Matherson also had several tenured agents mention that Ms. Giles was incompetent and "no one" wanted to be on her team.

97.

Ms. Matherson believes that Defendant's HR and Management placed her on Ms. Giles' team because they were well aware that she would receive no support. They knew the situation would impact Ms. Matherson's ACW and handle time, giving them reason to place her on a PIP and eventually fire her.

98.

Ms. Matherson repeatedly voiced her concerns with the lack of support to Ms. Giles and Ms. Cannon throughout the months of February and March 2019 to no avail.

99.

At that point, Ms. Matherson decided that it might be easier to request some time to sit with a tenured agent. Gwen Bierce is one of the tenured agents that sat next to Ms. Matherson, so she decided to be proactive and asked Ms. Bierce if she was willing to help. Ms. Bierce said she would be happy to sit with Ms. Matherson. Plaintiff started asking Ms. Giles to arrange this in February 2019 and continued to ask through the day she was terminated. Ms. Giles noted the request on several coaching sheets.

**Ms. Matherson's Continued Accommodation Requests**

100.

Ms. Matherson had a meeting with Plaintiff's direct supervisor Ms. Giles on March 1, 2019, which was not to discuss Ms. Matherson's attendance/adherence, but instead to discuss that the WFM team had incorrectly coded her occurrences in January and February 2019.

101.

The 5-minute meeting was simply to advise that the WFM team had incorrectly coded a few of her episodes and since it was the company's error, she would not have any negative repercussions. In fact, she was told by a member of the WFM team that the problem was a direct result of Ms. Giles having never instructed them to code anything over an hour as unpaid time.

102.

It is Ms. Matherson's belief that Management, HR, and the Accommodations team had decided to delay their response to the second accommodation request long enough for her to accumulate enough occurrences to be terminated.

103.

Ms. Cannon advised that going forward they would be following the accommodation exactly as written, meaning that

they would be charging attendance points for any occurrence over an hour.

### 104.

Ms. Matherson never acknowledged or agreed to any harm to the operations at Thermo Fisher during that meeting because it was never discussed.

### 105.

Ms. Matherson reminded Ms. Cannon that she had been hesitant to sign the first accommodation because the way it was written didn't meet her needs as a Type 1 Diabetic with complications.

### 106.

Ms. Matherson also reminded Ms. Cannon that she had advised Ms. Matherson to request additional accommodations when/if needed. Thermo Fisher was well aware that an updated accommodation request had been submitted.

### 107.

Plaintiff never received any communication from Thermo Fisher's Accommodations team or local Management/HR despite multiple verbal and written requests for a status update.

### 108.

She was initially advised they had not received it.

109.

When Ms. Matherson provided proof from her doctor's office that it was in fact received on February 24, 2019, Ms. Cannon "checked into it" and then admitted it was received and was in the hands of the Accommodations team.

110.

Throughout the months of March and April 2019, Ms. Matherson made multiple verbal and written requests for an update on her new accommodations request. She contacted Thermo Fisher's local Management and HR, as well as the Accommodations Team to no avail.

111.

As of Plaintiff's termination date she still hadn't received an update despite Thermo Fisher having received the new accommodations request two (2) months prior.

112.

Each time that Ms. Matherson experienced an episode over an hour, Thermo Fisher immediately advised that she had incurred an attendance infraction.

113.

And each time she would explain that she had been diagnosed with a new Diabetes related complication that is permanent and must be carefully managed.

- 26 -

114.

Ms. Matherson also continued to advise that the hostile work environment caused by lack of support from Management and HR was causing her undue stress, which was having dire consequences on her health.

115.

She incurred the 10th infraction on April 19, 2019. As soon as she returned to her desk from treating an extreme blood sugar episode, Ms. Giles stood up from her desk and walked to the middle of the call center floor and proceeded to yell at Ms. Matherson that she just received her 10th infraction.

116.

Ms. Matherson told Thermo Fisher that she knew that she could be an asset to the company if only they were willing to work with her.

117.

She offered to come in early or stay late when an incident occurred so any time missed could be made up.

118.

She also offered to be "on-call" and available to provide coverage if Thermo Fisher was short staffed.

119.

Ms. Matherson offered to do "anything she could," including working weekends, doing administrative tasks, providing clerical support, etc.

120.

On or around January 25, 2019, Ms. Matherson learned from a coworker on Thermo Fisher's International Team that there was a position available on their Team.

121.

The International Team handles most of their customer communication via email due to time differences.

122.

Ms. Matherson explained to Ms. Cannon and Ms. Giles that this type of position would be a good fit for her because she could treat and recover at her desk without affecting the customer experience.

123.

Ms. Matherson was told that there was no open position posted, so there was no way to apply.

124.

Ms. Matherson inquired about the position on the International team several times throughout the months of

February, March, and April 2019. She was repeatedly told that there was no way to apply for a position that was not posted.

125.

The position was posted the day after Plaintiff was terminated.

### Ms. Matherson's Termination

126.

Ms. Matherson was terminated on April 22, 2019.

127.

The policy in place during Ms. Matherson's employment was that all employees, regardless of tenure, were allowed 10 infractions and that a verbal, written, and final warning had to be given to said employee prior to termination.

128.

Thermo Fisher failed to follow its own policy, as Ms. Matherson received no written warning[5] or final warning prior to her termination.

---

[5] Except for an inaccurate performance coaching form that stated if her metrics did not improve within a month, she would be placed on a performance improvement plan (but not terminated). See April 11, 2019 Performance Coaching form that Ms. Matherson refused to sign because (and management agreed) that the metrics stated on the form were actually not correct due to her allowed extra 5-minute breaks (from her first accommodation request) that were not being taken into consideration when the metrics were being tabulated, attached as Exhibit "8."

129.

It has become obvious to Ms. Matherson that this is a case where Defendant did not want to accommodate a new hire, even though it was required to do so under the ADA, as it clearly feared that after 12 months of employment, Ms. Matherson would also be eligible to take FMLA leave, in addition to requesting reasonable accommodations, and Defendant did not wish to go that route. Ms. Matherson's supervisor made this decision and HR supported the supervisor in that decision.

130.

It has become obvious to Ms. Matherson that she was being singled out and discriminated against because of her disability.

131.

Thermo Fisher has discriminated against Ms. Matherson by refusing to engage in the interactive process and failing to grant her reasonable accommodation requests.

**COUNT ONE**
**AMERICANS WITH DISABILITIES ACT — FAILURE TO REASONABLY ACCOMMODATE**

132.

Plaintiff hereby incorporates, adopts and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

133.

Ms. Matherson had had to receive treatment for her Type I Diabetes for nearly her entire life and continues to receive treatment even to date.

134.

Plaintiff's Type I Diabetes, treatment, and related illnesses are a disability as defined by the ADA.

135.

Plaintiff was substantially limited in one or more major life activities, including digestive and bowel functions and the ability to think and concentrate.

136.

At all times relevant hereto, Plaintiff was qualified for her position as a CSR.

137.

Plaintiff had the skill, experience, education and other job-related requirements for this position, for which she was hired in October 2018.

138.

Plaintiff could perform her essential job functions with or without reasonable accommodation.

139.

As set forth above in the Statement of Facts above, Defendant knew that Plaintiff suffered from Type I Diabetes.

140.

As set forth above in the Statement of Facts above, Defendant knew that Plaintiff had to receive treatment for her Type I Diabetes.

141.

Plaintiff provided Defendant with enough information for Defendant to understand that she had a long-term illness that qualified under the ADA as a disability and that she was requesting a reasonable accommodation.

142.

Defendant could have granted Plaintiff a reasonable accommodation that would have allowed her to be successful in her position as a CSR.

143.

As set forth in the statement of facts, throughout October- December 2018 and on February 24, 2019 Plaintiff provided Defendant with additional details as to why she needed to be able to take extra time to test, treat, and recover from high and low blood sugar episodes while at work.

144.

On March 1, 2019, Defendant set up a meeting to essentially give Plaintiff a performance review.

145.

During that meeting, Defendant criticized Plaintiff for her absence from work for medical treatment and recovery, but never discussed her recent (i.e. second) reasonable accommodation request.

146.

Plaintiff's requests to be able to step away from a task to attend to a high or low blood sugar episode and make up the time thereafter that same day (or on a different day if Defendant so chose) for treatment and recovery from a disability or record of disability were requests for reasonable accommodation as defined by the ADA.

147.

The accommodation of being allowed to step away from a task to attend to a high or low blood sugar episode and make up the time thereafter that same day (or on a different day if Defendant so chose), to transfer to another department, or a telework agreement would have enabled Plaintiff to effectively perform the essential functions of her job.

148.

Alternatively, had Defendant interacted with Plaintiff in a good faith effort to accommodate Plaintiff's disability, another reasonable accommodation could have been identified.

149.

Rather than provide Plaintiff with the reasonable accommodation she requested or engage in good faith in an interactive process to identify how to accommodate her disability, Defendant terminated Plaintiff's employment.

150.

Defendant failed to make reasonable accommodations for Plaintiff's known disability-related limitations in violation of Defendant's obligations section 42 U.S.C. §12112(b)(5)(A) of the ADA.

151.

Defendant terminated Plaintiff's employment based on the need to make reasonable accommodations for Plaintiff's disability in violation of the section 42 U.S.C. §12112(b)(5)(B) of the ADA.

152.

In addition to failing to comply with the ADA's requirement of reasonable accommodation, itself sufficient to violate that statute, Defendant intentionally, with malice and reckless indifference to Plaintiff's rights, violated the ADA by terminating her employment because of her disability and/or her need for reasonable accommodation.

153.

As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including health insurance benefits.

154.

In addition, Defendant's actions have caused, continue to cause, and will cause the Plaintiff to suffer damages for physical pain and suffering, emotional distress, mental

anguish, loss of enjoyment of life, and other non-pecuniary losses all in an amount to be established at trial.

155.

Moreover, Plaintiff is entitled to an award of damages for future lost wages and benefits of employment.

156.

Defendant's discriminatory conduct has caused and continues to cause Plaintiff to suffer substantial physical and mental/emotional distress, fatigue, and inconvenience.

## COUNT TWO
### AMERICANS WITH DISABILITIES ACT — DISCRIMINATORY DISCHARGE

157.

Plaintiff hereby incorporates, adopts and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

158.

Since February 2019, Ms. Matherson has been subjected to different terms and conditions of employment comparatively to her co-workers.

159.

Upon information and belief, Defendant would not have discharged Plaintiff had she not been disabled.

160.

Defendants' actions amount to a violation of the ADA, 42 U.S.C. § 12112, which prohibits discrimination on the basis of disability.

161.

In discharging Plaintiff on account of her disability, Defendant acted with malice or with reckless indifference to the federally protected rights of Plaintiff.

162.

As a direct and proximate result of Defendant's discrimination on the basis of Plaintiff's disability, Plaintiff has suffered lost wages and benefits, as well as emotional distress.

163.

Defendant's discriminatory conduct towards Plaintiff has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

**COUNT THREE**
**AMERICANS WITH DISABILITIES ACT — RETALIATION**

164.

Plaintiff hereby incorporates, adopts and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

165.

Defendant's refusal to consider a transfer and the alleged verbal counseling of Plaintiff in March and April 2019 were in whole or in part in retaliation for Plaintiff's opposition to Defendant's failure to accommodate her disability, in violation of 42 U.S.C. § 12203(a).

166.

Thermo Fisher discriminated against Ms. Matherson when Ms. Cannon, Ms. Giles, and Ms. Seles continuously drug their feet on the interactive process (after Ms. Matherson made multiple reasonable accommodation requests and followed up multiple times) and ultimately when Thermo Fisher terminated her employment.

167.

Thermo Fisher also retaliated against Ms. Matherson for requesting said reasonable accommodations when Ms. Cannon and Ms. Giles refused to allow her to apply for a transfer to the

international team and continuously noted her "point accumulation" for attendance infractions related to her disability, when HR supported Ms. Cannon and Ms. Giles in their retaliatory actions, and ultimately when Thermo Fisher terminated her employment. As detailed above, these actions were done in an effort to intimidate Plaintiff from exercising her right to oppose Defendant's unlawful employment discrimination practices and thus also constituted illegal retaliation in violation of 42 U.S.C. § 12203 (b) of the ADA.

168.

Defendant's multiple false allegations against Plaintiff have been made in an effort to intimidate Plaintiff from exercising her right to oppose Defendant's unlawful employment discrimination practices and thus also constituted illegal retaliation in violation of 42 U.S.C. § 12203 (b) of the ADA.

169.

Defendant intentionally, with malice and reckless indifference to Plaintiff's rights, violated the ADA by retaliating against her for requesting a reasonable accommodation, although they knew or should have known that the ADA prevents employers from retaliating against employees covered by the ADA.

170.

As a direct and proximate result of Defendant's intentional discrimination and retaliation, Plaintiff has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including health insurance benefits, all in an amount to be established at trial.

171.

In addition, Defendant's actions have caused, continue to cause, and will cause the Plaintiff to suffer damages for emotional distress, mental anguish and other non-pecuniary losses, as well as damages to her personal and professional reputation.

172.

Moreover, Plaintiff is entitled to an award of damages for future lost wages and benefits of employment.

## COUNT FOUR
## ATTORNEY'S FEES

173.

Plaintiff hereby incorporates, adopts and realleges the foregoing paragraphs of this Complaint as if fully set forth herein.

174.

Defendant has acted in bad faith and has been stubbornly litigious, causing Plaintiff unnecessary trouble and expense. Consequently, Plaintiff is entitled to recover attorney's fees pursuant to O.C.G.A. § 13-6-11.

175.

Plaintiff is also entitled to recover her reasonable her and expenses, including attorneys' fees, as part of their recovery from Defendant for Defendant's violations of federal law.

**TRIAL BY JURY DEMANDED ON ALL COUNTS.**

**WHEREFORE**, Plaintiff prays that this Court:

a. Issue a declaration that Defendant engaged in unlawful employment practices in violation of, and violated Plaintiff' rights under the ADA;

b. Award Plaintiff all of her back pay and lost benefits which Plaintiff has suffered as a result of Defendant's violations;

c. Award Plaintiff compensatory damages in an amount commensurate with the pecuniary losses imposed upon her by Defendant's unlawful, discriminatory and retaliatory acts, including but not limited to her lost wages and employment benefits;

d. Award Plaintiff compensatory damages sustained as a result of Defendant's unlawful, discriminatory and retaliatory acts, including but not limited to damages for future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses sustained by Plaintiff as a result of Defendant's violations of the ADA;

e. Grant a permanent injunction enjoining Defendant, its officers, agents, successors, employees, attorneys, and those acting in concert with them, from engaging in any employment practice or policy which discriminates against the Plaintiff and other qualified employees on the basis of disability in violation of the ADA;

f. Grant a permanent injunction enjoining Defendant, its officers, agents, successors, employees, attorneys, and those acting in concert with them, from retaliating against Plaintiff or other qualified employees for engaging in activity protected under the ADA;

g. Grant Plaintiff an award of damages for future lost wages and benefits of employment;

- 42 -

h. Grant Plaintiff an award of her medical expenses which she has incurred as a direct result of the injuries inflicted upon her by the conduct of Defendant, in an amount to be proven at trial;

i. Grant Plaintiff liquidated damages for the Defendant's willful, intentional, malicious and recklessly indifferent violation of Plaintiff's rights under the ADA;

j. An award of punitive damages to punish Defendant's willful and intentional violations of the ADA as provided by 42 U.S.C. § 12117(a);

k. Grant Plaintiff special damages for all out-of-pocket costs and expenses that she would not have incurred but for the Defendant's unlawful conduct, including costs incurred in bringing this action and her reasonable attorneys' fees;

l. Issue an Order requiring reinstatement of Plaintiff's rights to health insurance and other benefits under Defendant's benefit plans;

m. Issue an Order granting Plaintiff costs and attorney's fees per O.C.G.A. §13-6-11, as well as reasonable expert witness fees together with any and

all other costs associated with this action as provided by the ADA;

n. Award Plaintiff pre- and post-judgment interest at the maximum rates allowable by law;

o. Grant Plaintiff a trial by jury of all issues so triable; and,

p. Grant such additional relief as this Court deems necessary, appropriate, just and proper.

This 22nd day of April, 2021.

### HORNSBY LAW GROUP

*/s/ Amelia D. Grubbs*
Amelia D. Grubbs
Ga. State Bar No. 696724

1180 W Peachtree St NW #2220
Atlanta, GA 30309
Tel: 404-577-1505
Fax: 404-577-1565            Attorney for Plaintiff